Good morning. The next case on the calendar is Catalyst Pharmaceuticals v. Alex Azar and Jacob Jacobus Pharmaceutical Company, Inc. Is everyone ready to proceed? Yes, Your Honor. Yes, Your Honor. Mr. Perry, would you like to save some time for rebuttal? Four minutes, Your Honor, please. And then, Mr. Springer, are you going to take ten minutes? Yes, Your Honor. Okay, and Mr. McIlvain, would you like the five minutes, remaining five minutes? Yes, Your Honor. All right, perfect. Mr. Perry, you may proceed. Thank you. Good morning, Your Honor. May it please the Court, Bill Perry for Appellant Catalyst. FDA cannot, consistent with the text of 21 U.S.C. 360 CC, do what it's attempting to do here. That provision governs the scope of my client's orphan drug exclusivity. The key terms in that provision are same drug, same disease and condition. FDA cannot approve another application for the same drug for the same disease and condition for seven years after it approved ours. But six months into our seven-year exclusivity period, that's exactly what FDA did, and it did it for intervener Jacobus. Here, the meaning of the key terms, same drug, same disease and condition, those plain terms, are admitted. They're admitted both in the record, and they're admitted in the briefing below. Both parties, FDA and intervener Jacobus, have said that they agree that those terms mean what Catalyst says they mean. And frankly, that ought to be the end of this case. This is a Chevron step one case, and the Court need go no further. But in addition to that plain language of 360 CC, including an exclusive list of exceptions in that same provision, Congress made it very clear throughout the Act and throughout other provisions of the Food, Drug and Cosmetic Act that it intended here to create broad exclusivity to spur drug makers to bring orphan drugs to the market quickly. So if I might, Your Honor, I'd like to begin not only with the plain language of same disease or condition, but also the specific exceptions in 360 CC. And the reason I'm addressing those, Your Honor, is because this Court's precedents make quite clear what to do in a situation where Congress lays out specific exemptions like these. We cited, for example, John Leland, a case in the circuit, and U.S. v. SPOR. They stand for the proposition that when Congress provides exceptions in a statute, it does not follow that courts have authority to create others. Here, the exceptions are listed principally in 360 CC's subsection B. If we can't supply sufficient quantities of the drug, you can breach our exclusivity. Or if we consent, perhaps we have a contract with another manufacturer or some other type of arrangement, and we consent to them serving part of the patient population, that's another exception to our exclusivity. There is also a clinical superiority-related provision that follows in subsection C through E. We can talk about that at length. But the point is that these are the exclusive list. None of these applies in this case. And under this Court's precedent, FDA cannot create another unwritten exception. So if I might, Your Honor, let me show you what FDA is actually attempting to do in its brief. And the easiest way to do that is not just referring to the text of their brief, but is referring to their regulation where they describe what they do in applying exclusivity. Now, as I mentioned, the statute actually says same drug, same disease and condition. But if you look at the regulation at 21 CFR 316.31, what FDA has actually done is insert different words. Congress did not choose to do that, Your Honor. What they insert here is sufficient to change the sentence in the following way. No longer does the sentence say may not approve another application for the same drug for the same disease or condition. That's the statutory language. The regulatory language is that FDA may not approve another application for the same drug for the same use or indication within the same disease or condition. Now, let me suggest this. Use or indication in a number of circumstances, as the government admits in its briefing, can mean the same thing as same disease and condition. You can have a drug that's approved for the entirety of the disease or condition. But here in this case, use or indication is more narrow than same disease or condition. And what effectively FDA is doing is deciding it will narrow the scope of our exclusivity to something that Congress did not intend and then divvy up the specific indications within that same disease and condition among different companies. It cannot do that under the plain language of this text. So there are also, of course, other provisions in FDA's regulations that ignore the plain text of this provision. Elsewhere in the regulations, they simply replace the term same disease and condition with same indication or use. And, of course, in certain cases, including this one, those two terms mean something different. So what they are actually doing here is saying that a pediatric use or indication for the same disease and condition, which is uncontested, both are for limbs, that's the disease at issue. And may I clarify, and I just want to confirm in the record, my understanding is that the drug is the same. It has the same ingredient. Same active moiety, which means active ingredient, Your Honor. It is the same drug. And all the parties have admitted that. Our opening brief at pages 29 through 30 walked through the record and the party's admissions on that point. I mean, you would concede, though, if they had come up with another drug that had a different active ingredient, then they could receive a license for that. Well, absolutely, Your Honor. If it's not the same drug, if it's a different drug, then our exclusivity doesn't apply. And there's you know, certainly you could have a different active moiety or FDA could determine that a different drug is clinically superior under its regulations and under the statute and thus a different drug. But that did not happen here. In fact, we know that Jacobus's drug is not clinically superior to ours the way that FDA manages that process. Let me ask you a question, counsel. That struck me as an interesting one. It doesn't go to text. It doesn't answer the question about whether the text is clear and unambiguous or whether it alternatively is subject to two reasonable and different interpretations. But the FDA posits the following. They say, for example, if a drug could be designated to treat ovarian cancer, but it only approved the drug for stage four ovarian cancer. Your interpretation would yield the result that for seven years, other sponsors could not obtain approval for developing the same drug to treat stage one, two, or three ovarian cancer. And they say that the reading you would put on it is at war with the obvious purpose of Congress in enacting the statute. Your response to that, as best I can tell from the briefing to this hypothetical, is that the most likely scenario is that this drug sponsor with exclusivity would seek to market to those individuals. But that would lead the treatment of already an undeserved population to the will of the manufacturer, wouldn't it? No, Your Honor, both for legal and factual reasons related to ovarian cancer. So let me start with the legal reasons, if I might. FDA has authority, Judge Legault asked me a question that brought up this authority just a moment ago, has authority to determine in a situation where some untreated population, like for example stage three or stage two or stage one of ovarian cancer, to determine that a drug that comes along later is clinically superior and therefore a different drug. If there is a different drug out there, then the restriction, which is applicable to same drug, same disease or condition, would not apply and our exclusivity would not bar those. Now, as to the population of drugs for ovarian cancer, there are currently something like 21, 22 drugs approved for ovarian cancer. As far as we can tell from going through the records that are available, not a single one of those drugs would be barred by a ruling. If a ruling in our favor came out in this case, and it were applied in that context, not a single one of those drugs would be barred, as far as we can tell from the record. But even if there were an issue, that issue could be addressed through this clinical superiority tool that FDA has. And let me explain just a bit more, if I might, Your Honor, about how the statute deals with this issue. So, back to Section 360 CC. This is the overall policy that Congress adopted. And importantly, Congress did not choose to do what FDA is seeking to do here. So, in 360 CC, we talked about the basic restriction on same drug, same disease, subsequent approvals. That does not apply to the holder, of course. So, we could get a drug on the market quickly and then supplement the scope of our approvals as quickly as we can. That is indeed what happened with ovarian cancer. There were multiple drug makers that came in with orphan drug exclusivities and then, pursuant to this statutory provision, updated those to be broader. And in fact, the statute, as I indicated earlier in the exception section, allows somebody who holds exclusivity to contract with another company and then give consent to them doing it as well. But if none of that is still covering the core patients that I think your question raises concern about, then FDA has the ability to deal with it. Now, that question came up. FDA's response was not, we can't deal with that through clinical superiority. They did not say that. What they said was, we would have to take a look at it. Why couldn't the exception that has to do with cannot assure sufficient quantities, why would that not apply to allow FDA to allow a different company to come in and take care of stage three and earlier stages? Again, factual question, and I can provide you with a factual answer. We can supply the entire population, all patients, and here's why. We can supply the 99% who are adults right now, and then we can supply the pediatric patients through different mechanisms in the statute. And those mechanisms sometimes are called compassionate use or expanded access. We can also, of course, obtain approval. We have the data to obtain approval for pediatrics, just as much data as Jacobus had available. So there is not factually an insufficient quantity of drug. We can cover everybody and we would, Your Honor. So you're saying that the exception for insufficient quantity cannot apply simply to a situation where there is not an approval for those other uses? I do not think so, Your Honor, because that is a factual question governed by the regs. They'd have to ask us if we have sufficient quantities, and we would demonstrate to them that we do, they'd make a record, and we would satisfy that inquiry. I see, Your Honor, that my time is up. Thank you, Mr. Perry. You have four minutes remaining for rebuttal. Mr. Springer, you have 10 minutes, and I'll tell Mr. McElvain when his five minutes is up. Thank you. Good morning, Your Honors, and may it please the Court. Brian Springer on behalf of the Federal Defendants' Appellees. I want to take a step back and emphasize what this case is really about. Catalyst interpretation of the exclusivity provision would work a fundamental shift in the statute and would turn the Orphan Drug Act on its head. The Orphan Drug Act is designed to increase access to approved drugs to patients with rare diseases or conditions. Yet, under Catalyst interpretation, approval of a drug to treat just 1% of an affected population would deprive the remaining 99% of vulnerable individuals of an approved drug to treat their condition for a period of seven years. My understanding, Mr. Springer, maybe I read the record incorrectly, was that pediatric limbs was a very small percentage. Did I read the record incorrectly? No, Your Honor, those are the facts of this case. Okay, well, why don't we deal with the facts of this case? Okay, Your Honor. Yeah, to address the facts of this case, I think it's important to note that Catalyst does not have approval here to treat pediatric limbs. It has not gotten that approval and it has not shown that its drug is safe or effective for that use. Catalyst here seeks to create a no man's land where its drug is not approved and where no other... Your Honor, I think that the correct way to look at the exclusivity provision is to read the entirety of the language and to understand it in context with the new drug approval process that is expressly referenced in the exclusivity provision itself. What the language says is that FDA may not approve another application under Section 355 for the same drug for the same disease or condition. And so that beginning language, the approve another application language, and the express direction to look to Section 355... And my understanding is that same drug means if it has the same active ingredient or... And the facts in this case are that Jacobus' drug does have the same active ingredient. I mean, isn't that conceded? Your Honor, there's no dispute here that it's the same drug, but I think the important language to focus on here is the approve another application... And is it the same disease? I mean, I guess if it was the same drug, but for treating a different disease, then they would have an application, correct? That would be true if it were a different disease, Your Honor. But what is important to do here, and I don't think that the court would be plowing new ground to say this, is to focus on the language at the beginning of the exclusivity provision about approving another application under Section 355. As the D.C. Circuit said in Spectrum... May not approve another application, and then it says, and then it's modified by the phrase, until the expiration of the seven years from the date of the approval. So there is a modification for the approval for another application for the same drug for the same disease. That's the whole point of the exclusivity and the Orphan Drug Act, is it not? Is that you have someone who invests the money to create a drug, manufactured drug, that is going to help people who are suffering from a rare disease or condition. Your Honor, that's exactly what FDA has done here, is that they have tied the scope of the exclusivity to the investment that the drug manufacturer has actually made in order to show that their drug is safe or effective for use. And again, that leads back into this approve another application language, which the D.C. Circuit in the Spectrum case and the Fourth Circuit in the Sigma Tau case explained is important, and that the use of the word application directs the FDA to actually look at the application that is before the FDA and examine the proposed uses or indications within that application, and to make a determination about whether that drug manufacturer has shown that its drug is safe or effective for those particular uses. Let me ask you this question. It seems clear to me that your regulatory resolution is preferable to the statutory resolution, but that's not something that we can do if the plain language of the statute says same drug and same disease. Do you agree with Mr. Perry that the exception for assurance that the quantity can be met or that the other needs can be met simply would not apply in this case? It seems to me that if a company is refusing to proceed with approval for a use because, for instance, the need for it is so sparse, like here, they're just a few dozen cases of pediatric disease. When the company simply refuses to proceed to obtain the use, then we do have the problem that you talk about, that these needs are not being met. So why couldn't the assurance to satisfy those needs exception apply in that situation? Your Honor, I think it is possible that the exception could apply in a situation like this, and FDA just hasn't had the ability to look at that because, as you note, FDA for years has interpreted this provision to tie exclusivity to particular uses or indications, and so hasn't had to consider the question in the way that Your Honor is talking about. I think one important thing to note about the exceptions is that when an exception applies, it breaks the earlier exclusivity holders, exclusivity entirely, and allows the second drug to enter the market for all indications and uses. So here, in this case, if an exception applied, including if FDA were to determine that Jacobus's drug is clinically superior to Catalysts, that would allow Jacobus to enter the market for all indications and uses. May I ask you a question? Under the statute in question, with regards to the exception, it specifically says that the Secretary needs to provide notice and opportunity to the holder of the exclusive license to ensure that they don't have sufficient availability of the drug. For example, in that particular exception, that there has to be notice and opportunity to, I guess, in essence, to say, look, we can provide the drugs for pediatrics if that's required, and we have it. I mean, has that been done here? So that has not been done here, Your Honor, because again, because of FDA's interpretation of the exclusivity provision, and as you say, this allows the manufacturer to come in and explain the extent to which it can provide this drug. But I would just underscore the point that I think Judge Anderson was getting at, that there is sort of a mismatch here and a bit of confusion about why we would be asking whether or not Catalysts can provide its drug to a portion of the population, which again, it does not have approval to treat. It does not have approval for treatment of the pediatric population. But I understand that, but that's a policy decision that the FDA did or didn't do. But at the end of the day, the statute, from my perspective, is not unambiguous. So you'd be asking us to rewrite a statute, and that's not what a court does. We don't rewrite contracts, we don't rewrite statutes. So at the end of the day, the question becomes, that may be what the FDA wants to do. But it seems to me that if the language of the statute is such that exclusivity, someone has exclusivity for a same drug for the same disease for a period of time, then the FDA has to follow the procedure that has been put in place in the statute by Congress. Well, Your Honor, I would resist the conclusion that the exclusivity provision unambiguously answers the question in this case, because again, I think looking at the language, it points to Section 355, the new drug approval process. And in that process, FDA doesn't approve a drug for a disease or condition in the abstract. It actually looks to the application, which again is referenced in the exclusivity provision, to make a determination about what the manufacturer has shown to be safe or effective for use. But I think if Your Honor... But again, you would be asking us to incorporate use or indication into the statutory language that does not exist right now. Your Honor, I think it does exist, or at least it's a reasonable interpretation for it to exist. It's in a visible ink and I didn't see it. Your Honor, I think it comes in through the express reference to the new drug approval process, to the explicit reference to Section 355, and to FDA's actual examination of applications looking at what the drug manufacturer has proposed. But what Judge Lagoa is saying is, inevitably, your interpretation has to change that language for the same drug for the same disease to language something like for the same drug with respect to the same use for the same disease. You have to... Your interpretation just necessarily inserts that word use before disease, does it not? Your Honor, I don't think it does. Again, I think that FDA is interpreting this provision in context and understanding the fact that when FDA approves an application, it's not approving an application in the abstract for a particular disease or condition. It's approving it, again, looking at Section 355 and the new drug approval process. It's doing that approval with respect to the particular indications or uses. That is true, but the designation provision you concede is broader. The designation proceedings precede, come before the approval, and they approve it for a disease. So then the approval of the use comes later and is often narrower. That's exactly right, Your Honor. And I think that's an important point is that the designation is much broader because at that time, there's very little known about what the drug, which uses the drug will be safe and effective for. However, once you get to the stage where FDA is actually approving an application, it has that information in front of it and is making a determination based on the application that's in front of the FDA at the time. If Congress Council had wanted to write the statute the way you read it, it would have written this statute a little bit differently, wouldn't it? It could have referenced the same drug with respect to the same use. It could have put that language into 360 CCA, but did not. That wouldn't have been hard to do, would it, as a textual matter? Your Honor, I think Congress could have done that, but it may have wanted to leave FDA to make these kind of policy decisions and to calibrate this provision and create coherence between the Orphan Drug Act and the new drug approval process through which FDA actually approves these drugs and determines whether or not they're safe or effective for particular uses. Your Honor, I see that I am over time. For the reasons stated in our brief, we ask that you affirm the district court. Thank you, Mr. Springer. Mr. McIlvain, you will have five minutes. Thank you, Your Honor, and may it please the court, Joel McIlvain for the intervener of Jacobus Pharmaceutical Company. Catalyst has offered a reading that fails to account for the text, the structure, and the purpose of the Orphan Drug Act. In contrast, the FDA and our client Jacobus has offered a reading that accounts for all three. Consider first the text of the operative provision here, section 360 CCA. What is being compared at bottom here is not the drug to the drug or the disease to the disease. What is being compared is the first approval by the FDA of an application under section 355 to a second potential approval by the FDA of an application under section 355. If you turn to section 355, the FDA does not approve an application for a drug full stop or does not approve an application for a drug for a particular disease full stop. Instead, the only thing that the FDA is empowered to do under section 355 is to approve a drug for a particular use or indication. So what is necessarily being compared, turning back to section 360 CC, is the first approval of a drug for a particular use or indication to a second approval for a potentially the same use or indication. Now, Catalyst offers a reading that reads section 355 out of the statute, reads the reference to uses or conditions out of the statute. And by stripping that language out of the statute, Catalyst creates a host of problems throughout the structure of the Orphan Drug Act and throughout the Food, Drug, and Cosmetic Act, which is why we would suggest that the court reject that reading and hold that the FDA's reading and its regulations that have been in place for 40 years is at least a reasonable construction of the statute. Turning to one of the potential anomalies that Catalyst's reading creates, Judge Anderson, you asked about the exception for insufficient quantities. If you consider the text of that exception itself in 360 CCB, specifically what Congress is saying is that if the first sponsor who has first gained exclusivity is unable to provide insufficient quantities of its drug to serve the population, then it is possible that its exclusivity could be broken to allow another manufacturer into the market. But here, consider the facts of this case. Catalyst has approval to serve adults with limbs. It does not have approval to serve pediatric patients with limbs, and the reason is it has never attempted to make a showing that its drug is safe and effective for pediatric patients. It's drug cannot serve pediatric patients, and the problem here is not a problem of insufficient quantities of Catalyst's drug. To the contrary, Catalyst could flood the nation with as many doses of its drug as possible, and that drug still could not serve pediatric patients because it does not have approval for that population. So when Congress crafted the exception for insufficient quantities, it was necessarily assuming that it was dealing with a universe where the only potential problem was the issue of insufficient quantities as opposed to some other qualitative problems such as the manufacturer not even having approval in the first place to serve the population. So the fact that Congress crafted that exception in 360 CCB the way it did shows that Congress necessarily understood that the scope of the approval in the first place and the scope of the orphan drug exclusivity in the first place were coterminous and only reached as far as the approval for this particular use or condition. But under the statute in question, the exception that you're talking about, does the secretary not have to provide the holder with notice and an opportunity? If the secretary were proceeding under that section, then yes, then that would be the procedure. That didn't happen here because that wasn't the way that anybody was proceeding. Instead, the FDA understood under its regulations, which again have been in place for 40 years, that Catalyst didn't even have exclusivity that reached that far in the first place, and so the exception did not need to apply. If we do reach a world where the court believes that the FDA should have proceeded under that exception again, I would suggest at least that the court remand the case without vacater to allow those proceedings to occur. But again, I would suggest that we do not even reach that point here because the actual text of that exception supports the FDA's reading that exclusivity does not reach beyond uses or conditions under its regulations that are in place for 30 plus years and under the reading that has been endorsed by the DC Circuit and the Fourth Circuit of the statute. Thank you, counsel. Thank you. Mr. Perry, you have four minutes for rebuttal. Thank you, Your Honor. Let me start with sufficient quantities, if I might. It is not true that the only way to serve patients is through a drug approval under Section 355. Before either Catalyst or Jacobus were approved as drugs approved under that section, they both supplied pediatric patients with the active ingredient as a drug that we're talking about here because there are other ways to provide drugs to patients. I use the term expanded access, compassionate use. There's even a provision for open protocols and 360 DD that the court can review, but there are ways to supply drugs to patients outside the context of an approval under 355. And Your Honor, to make that point incredibly clear, I would like, if I could, to refer you all to a section of the Joint Appendix, which was in the record below. And it's a discussion in Volume 4, Tab 70, page 1153, where the question before FDA, this is an internal FDA document, it's a decision document on the exclusivity issue, but they discuss the possibility that Jacobus could continue to apply or, sorry, supply its drug to pediatric patients, other patients, despite our exclusivity. And they explain that Jacobus could do so under an expanded access program, which, of course, is not a formal drug approval. So when Mr. McElveen suggested we could not serve pediatric patients, there are many ways for us to do that. So it is not the case. And in fact, there's five ways that we could supply pediatrics or that another company could supply pediatrics. The way I just described what we would do, Jacobus could continue to supply under its expanded use or expanded access program. We, of course, could get drug approval for those pediatrics, which we would pursue on an expedited basis. If there ever were a settlement of this and other cases, we could consent to Jacobus doing that. And of course, our drug can be prescribed off-label to pediatric patients. All of those questions get roped into the factual issue. And Judge Legault is right. We deserve the opportunity to address that issue before FDA makes a decision on whether or not there are sufficient quantities out there. So as a factual matter, there are absolutely sufficient quantities. That is not a reasonably disputable fact. So let me turn briefly, if I might. Before you do, counsel, let me ask you just one question. Could you comment on the Fourth Circuit case and the D.C. case that they referenced for me? I don't think they're precisely on point. The issue is not precisely the same, but it provides perhaps some illumination of what Congress had in mind when it used these words. What do you have to say about it? Let's start with the Fourth Circuit case because the D.C. Circuit adopted the Fourth Circuit's approach in spectrum. I agree entirely, Your Honor. Sigma Tau is the Fourth Circuit case. And of course, you're right, Your Honor, that that was a separate set of issues than is at issue here. There, there were two sets of exclusivity for two different diseases. One had expired. A generic drug, this is common fact pattern in both cases, a generic drug had come along and was being sold with the label for the first expired exclusivity. And so that presents a very different issue than present here. The question was whether or not the generic was selling for the same or a different disease or condition. And the answer was they were selling for a different disease or condition than the active exclusivity. But Your Honor, very specifically, to answer your question, on page 140. Let me focus you very precisely on what I had in mind. The circuit said that by using the word such drug for such disease or condition, Congress made clear its intention that 360 CCA was to be disease specific, not drug specific. In other words, the statute as written protects uses, not drugs for any and all uses. And then it went on to say that the statute is clearly directed at FDA approved use, not generic competitor intended use. And in view of this textual emphasis on approved use, the evidentiary basis for the agency's approval must be the use for which the approvals as are sought. That is the use for which the generics are labeled. It's a plainly different. It's a different issue. There's no doubt about that. But they're commenting about some of the same words that we're looking to apply. And I'm asking you whether that illuminates this issue at all. Well, here's the answer, I think, to your question, Your Honor. When they use use in Sigma Tau, and then when they use indication and Sigma Tau and spectrum, they're talking about indication or use for the same disease or condition and not subsets of the same disease and condition. And you can tell that, Your Honor, because at page 144 of Sigma Tau and 145, they explain that the question presented is whether or not you have a generic selling for a different disease and condition and they go further. And they say the statutory language in this case, same drug, same disease and condition is unambiguous. So when they say in both cases that the question is whether or not it's disease specific, it's a question of whether or not the generics were being labeled to treat the disease that was still subject to exclusivity, they weren't. They were being they were labeled to treat a disease for which exclusivity and expire this language, the core language that is the foundation for our claim here is unambiguous, and the Sigma Tau court recognize that explicitly on page 145. So I think I have a question for you on this issue. For many years now the FDA has read this statute in this way. The regs go back a long time. It's received a certain accepted wisdom here. Congress has amended from time to time. The, the statute here they've never come back and said, you know, you've misread what we meant. Are we to make anything of that here. Your Honor our brief sets forth the case law that answers your question no, you should not make any of anything of that because ratification or acquiescence, those two doctrines only apply when you have a very clear indication, not present here that Congress was addressing the very specific issue in play. And if I might, Your Honor, in 20. I'm sorry in 2017. When this was last amended. Congress chose to retain the term disease and condition. It didn't change it to use or indication, it retained it, it wrote same disease or condition. So that's additional evidence that they mean what they say, Congress did not choose to put user indication of the statute at any point in time, even given the opportunity. Thank you, Mr Perry. Mr Springer. Thank you, Mr McElveen for your argument so it's very interesting. Have a good day. Thank you, Your Honor.